IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAURA E. CARRASCO,<br><br>    Plaintiff,<br><br>  v.<br><br>SAN RAMON VALLEY UNIFIED SCHOOL DISTRICT,<br><br>    Defendant.<br>_____/ | No. C 04-02395 CRB<br><br>**MEMORANDUM AND ORDER** |

In this employment discrimination action, plaintiff Laura Carrasco alleges that she was terminated in retaliation for opposing the discriminatory treatment of a co-worker, Mary Glenn, and also for filing a complaint about discrimination against herself. Now pending before the Court is the defendant's motion for summary judgment on all of plaintiff's claims. After carefully considering the papers filed by the parties, having had the benefit of oral argument, and having allowed plaintiff to supplement the record post-hearing, the Court concludes that no reasonable jury could find for plaintiff and therefore GRANTS defendant's motion for summary judgment.

## BACKGROUND

Defendant San Ramon Valley School District (the "District") hired plaintiff Laura Carrasco as a custodian in 1983. In 1990, defendant promoted plaintiff to Head Custodian at San Ramon Valley High School (the "High School"). The High School's principal or

assistant principal supervised the custodians, including the head custodian. From 1990 through September 2002 Carrasco had an unblemished work history; indeed, in July 2002, Assistant Vice Principal Lisa Ward wrote that "Laura does a wonderful job at running our custodial program. . . . She is an extremely important part of the success of SRVHS!" Declaration of Laura Carrasco ("Carrasco Decl.") Exh. 2.

Mary Glenn was the District's Director of Custodial Services and Child Nutrition and the District liaison to the District's food services agency, Sodexho. Glenn was the only African-American manager out of approximately 40 District management employees. She was also the only female out of approximately 10 classified management positions.

Carrasco was Glenn's "right hand person." Carrasco assisted Glenn in writing the custodian manual and during the summer Glenn supervised half of the 80 custodians while Carrasco supervised the other half. When Glenn did not have time to perform certain tasks, District officials would ask Carrasco to perform them.

**A.    The Glenn protest**

In August 2002, Glenn notified the District that she intended to file a lawsuit against it alleging discrimination in pay because she was paid less than other managers supervising fewer employees. The next month the District initiated an investigation into Glenn based on allegations that she took money in return for hiring certain custodians. Later that month Carrasco approached Glenn and asked Glenn if she was aware that the District was blaming Glenn for an $80,000 shortfall in the Sodexho budget. Glenn took administrative leave in September, and in November 2002 she retired.

On October 8, 2002, Carrasco wrote and circulated a petition to the Board of Education (the "Petition"). The Petition read:

> We the custodians are asking you to look into our manager's treatment by some of the district high management. Thomas Jamison and John Caldecutt are meeting with some of the custodians asking them to say Mary Glenn took money for a job. We talked to the same custodians and ALL OF THEM TOLD US THEY TOLD THOMAS JAMISON AND JOHN CALDECUTT THAT THEY GAVE MARY GLENN THE MONEY FOR BIRTHDAY AND FOR CHRISTMAS AS DO EVERYONE ELSE DOES FOR THEIR MANAGER. SOME OF THE CUSTODIANS SAID THAT THEY HAVE GIVEN GIFTS TO THOMAS JAMISON AND TONY DORIA WHO WAS THE CUSTODIAN BEFORE THE LAYOFF. WE FEEL AS THE BOARD YOU

2

> SHOULD LOOK INTO THE SODEXHO BUDGET SHORT FALL OF 80,000 DOLLARS. WE HAVE HEARD THAT THIS SHORTFALL IS GOING TO BE BLAMED ON MARY GLENN. BESSIE ARGALLON STARTED THIS RUMOR ON MARY GLENN BY GOING TO THOMAS JAMISON.
>
> PLEASE CHECK INTO THIS MATTER. MAY GLENN IS ONE OF THE BEST MANAGERS IN THIS DISTRICT. WE THINK YOU SHOULD FIND OUT THE TRUTH.

Carrasco Decl. Exh. 1. Carrasco and several other custodians signed the Petition.

### B. The District's discipline of Carrasco following the circulation of the Petition

In August 2002, Assistant Principal Sylvia Ryan took charge of custodial services at the High School. At the time there were two full time day-shift custodians, plaintiff and Emiliano Ochoa. According to Ryan, in September or October 2002, Ryan asked Carrasco to do something to which Carrasco loudly responded that Ryan could not tell her what to do. Carrasco disputes that the incident ever occurred. Shortly thereafter, Ryan became aware that Carrasco and the other day-shift janitor, Ochoa, were having problems. Ochoa said that Carrasco was always upset with him, and was always complaining about his not finishing his work. For example, he reported that Carrasco had yelled at him for helping to unload some chairs from a truck, and that Carrasco spoke to him too loudly. At the same time, Carrasco complained that Ochoa was not picking up trash in his assigned areas. Ryan and the principal, David Lorden, responded by admonishing Carrasco that her behavior toward Ochoa constituted harassment and that she was not to speak to Ochoa regarding performance issues. According to Lorden and Ryan, Ochoa was doing his job and Carrasco was asking him to pick up trash after his shift ended. Carrasco alleges that Ryan and Lorden solicited the complaints from Ochoa.

In December 2002, Ryan, Lorden, and Jim Shannon (who replaced Glenn) told Carrasco for the first time that she had to improve her productivity. This "advice" arose out of an incident in which Carrasco had spoken to the cafeteria manager about what had happened to Mary Glenn. According to plaintiff, the manager was spreading the rumor that Glenn had been fired and Carrasco corrected her that Glenn had resigned. Ryan told

Carrasco she was wasting her time in the cafeteria. Ryan also told Carrasco not to speak to Ochoa at all.

Also in December, Shannon told Carrasco not to have her son work as a substitute custodian.

On January 9, 2003, Carrasco attended a PTSA (Parent, Teacher, Student Association) meeting for 15 to 20 minutes during the day. Shannon had observed Carrasco attend a meeting the month before and he had not said anything to her. At the January 9, 2003 meeting, Carrasco told the parents that she (Carrasco) does not get much support from the administration about the trash issue. Principal Lorden got angry at Carrasco for attending the meeting and speaking negatively about the administration.

On January 15, a meeting was scheduled between Carrasco and the High School's administration to discuss the PTSA incident; instead of discussing the incident, Lorden, Ryan and Shannon observed that Carrasco had hired her son as a substitute custodian even though Shannon had specifically told her not to do so. Carrasco subsequently executed a "Last Chance Agreement" in which she acknowledged having improperly hired her son as a substitute custodian and attending the PTSA meeting during work hours without authorization. She also accepted a four-day unpaid disciplinary suspension and stated, in writing, that she understood that her failure to perform satisfactorily would likely lead to dismissal.

The next month officials claimed that Carrasco had spent 40 minutes during work hours talking to a cafeteria employee. At a meeting held on March 19, Carrasco was given the opportunity to take a demotion to custodian. She declined and was told that the District would provide her with an improvement plan in early May.

From March 19 through August 18 Carrasco went on medical leave for stress.

**C. Carrasco's discrimination complaint**

By letter dated March 26, 2003, Carrasco responded to the incident raised at the March 19 meeting. First, she claimed that Lorden and Ryan were treating her unfairly because she "refused to become involved in false and negative allegations against" Glenn.

4

After setting forth her factual disagreement with the administration's version of the February incident, and asking whether management had complied with the provision of the Last Chance Agreement providing that the administration would keep Carrasco informed of the administration's instructions to Ochoa, Carrasco wrote:

> I also find that the San Ramon Valley High School is in violation of School District Policies & Regs., Code of Ethics E4219.21, #4,5,6 and Non Discrimination in Employment AR 4030, #4.

She concluded her letter by stating that while past administrations had worked with her, she is currently "faced with harassment from different levels and types, and an administration creating turmoil amongst the employees." Carrasco Decl. Exh. 12.

The District responded by letter the following month and concluded that "the actions taken by the District to attempt to improve your conduct are appropriate." Carrasco Decl. Exh. 13. The District also stated that it would be working on an improvement plan to help improve plaintiff's performance as head custodian, since she was not interested in a demotion.

**D.   Carrasco's termination after her return to work**

When Carrasco returned to work from her stress leave, Carrasco was asked to sign, and did sign, written "objectives for improvement." The "Final Assessment" stated that "[a]ll of the objectives must be implemented immediately and sustain. [sic]  Further disciplinary action may result from any breaches of your responsibility." [sic] Carrasco Decl. Exh. 17.

On September 12, Ryan asked Carrasco to clean graffiti. Carrasco could not find the graffiti, but saw that the trash cans had not been emptied. She returned to Ryan to report that she could not find the graffiti and to complain about the trash. Ryan and two other witnesses claimed that Carrasco's tone was belligerent.

A few days later Carrasco was asked to turn on the school sign. It did not happen. Carrasco claims she turned it on, but that there was a problem with the timer. She was never notified that there was a problem until she was terminated in November. Around this time Lorden reminded Carrasco to keep the hallways clear of furniture. Carrasco responded that

5

they (the custodians) were doing their best. The District claimed this comment "was not responsive." Later that month Carrasco allegedly was not cooperative when asked to do some leaf blowing. She disputes these allegations.

Finally, on October 6 Carrasco allegedly authorized overtime without getting prior authorization from her supervisors. She claims Lorden asked her at 9:30 p.m. to put everything away after a football game. As her shift ended at 10:00 p.m., there was no way that could be completed without overtime.

Vice-principal Ryan subsequently provided Carrasco with her evaluation for the period October 2002 through November 2003. The evaluation found Carrasco's performance "unsatisfactory" in several areas and recommended the termination of plaintiff's classified service based on her failure to improve since the issuance of the Last Chance Agreement. On the same day, the District provided plaintiff with dismissal papers. After a *Skelley* hearing, the hearing officer recommended dismissal and the Board of Education adopted his recommendation. This lawsuit followed.

**PROCEDURAL HISTORY**

Plaintiff's First Amended Complaint makes two claims: a retaliation claim under Title VII and a discrimination and retaliation claim under California's Fair Employment and Housing Act ("FEHA"). Plaintiff alleges that because of her race, age, and gender, as well as her opposition to the discrimination against Mary Glenn, defendant "solicited and/or manufactured false allegations of alleged misconduct to conduct its investigation against Carrasco for the purpose of firing the plaintiff." First Amended Complaint ¶ 15.

Plaintiff's FEHA claim was dismissed on sovereign immunity grounds. Thus, the only claim remaining in this lawsuit is plaintiff's Title VII retaliation claim. The District moves for summary judgment on the ground that no reasonable trier of fact could find that the District terminated plaintiff's employment because of her race, age, or gender or in retaliation for her opposition to the District's allegedly discriminatory treatment of Mary Glenn. In her opposition, plaintiff concedes that she was not terminated on account of her race, age or gender; instead, Carrasco argues that a reasonable trier of fact could find that the

6

District terminated her employment in violation of Title VII in retaliation for her (1) opposition to the treatment of Mary Glenn, and/or (2) her March 2003 discrimination complaint.

## STANDARD OF REVIEW

### A. Summary judgment standard

A principle purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). A party moving for summary judgment that does not have the ultimate burden of persuasion at trial (usually the defendant) has the initial burden of producing evidence negating an essential element of the non-moving party's claims *or* showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, on the other hand, the moving party has satisfied its initial burden of production, then the non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. See Nissan Fire & Marine Ins. Co., 210 F.3d at 1102. A genuine issue of fact is one that could reasonably be resolved in favor of either party. A dispute is "material" only if it could affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

### B. Retaliation Under Title VII

Under Title VII, "it is unlawful 'for any employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] had made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." Stegall v. Citadel Broadcasting, Co., 350 F.3d 1061, 1065 (9th Cir. 2003)

(quoting 42 U.S.C. § 2000e-3 (2000)). To make a prima facie case of retaliation in violation of Title VII, a plaintiff "must demonstrate that '(1) she engaged in protected activity, (2) she suffered an adverse employment action, and (3) there was a causal link between her activity and the employment decision.'" Id. at 1065-66 (quoting Raad v. Fairbanks North Star Borough Sch. Dist., 323 F.3d 1185, 1196-97 (9th Cir. 2003)). "In addition, the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." Raad, 323 F.3d at 1197.

If the plaintiff makes a prima facie showing, the burden shifts to the defendant to "articulate a legitimate, non-discriminatory reason for the adverse employment action." Stegall, 350 F.3d at 1066 (internal quotation marks and citation omitted). If the defendant satisfies this burden, the plaintiff "bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive." Id. (internal quotation marks and citation omitted).

The Ninth Circuit "has set a high standard for the granting of summary judgment in employment discrimination cases." Schnidrig v. Columbia Machine, Inc., 80 F.3d 1406, 1410 (9th Cir. 1996). When a plaintiff "seeks to establish a prima facie case [of discrimination] through the submission of actual evidence, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder." Lowe v. City of Monrovia, 775 F.2d 998, 1009 (9th Cir. 1985).

## DISCUSSION

**A. Carrasco's opposition to the District's treatment of Mary Glenn**

Defendant moves for summary judgment on plaintiff's "Mary Glenn" retaliation claim on the ground that plaintiff has not made a prima facie showing that she engaged in protected conduct and/or that the District was aware she had engaged in such protected conduct.

To meet her prima facie burden of showing that she engaged in protected conduct, plaintiff must show that she had a reasonable belief that the employment practice she protested was unlawful under Title VII. See Trent Valley Elec. Ass'n Inc., 41 F.3d 524, 526

8

(9th Cir. 1994). An employee's "protest" is not "opposed to an unlawful employment practice" for purposes of Title VII "unless it refers to *some* practice by the employer that is allegedly unlawful." E.E.O.C. v. Crown Zellerbach Corp., 720 F.2d 1008, 1013 (9th Cir. 1983). Evidence of a plaintiff's sincerity in a claim that discrimination occurred is relevant to determining whether the plaintiff had a "reasonable" belief that discrimination occurred. See Strother v. So. Cal. Permanente Medical Group, 79 F.3d 859, 869 (9th Cir. 1996).

Plaintiff contends that she "prepared, circulated and submitted a petition to the San Ramon Valley School District in opposition to perceived discrimination against her supervisor, Mary Glenn." Opposition at 19. A reasonable jury could not find that plaintiff's opposition to the District's treatment of Mary Glenn was conduct protected by Title VII because plaintiff never in fact protested that the District was *discriminating* against Glenn.

First, it is undisputed that plaintiff *was not aware* that Glenn had told the District she (Glenn) was going to sue the District for discriminatory pay. There is no admissible evidence in the record that Glenn or anyone else ever told plaintiff about Glenn's claims of discrimination.[1]

Second, the Petition itself makes no mention of discrimination. The Petition contends that the charges against Glenn are fabricated and false; it does not suggest that the District is making the charges against Glenn in retaliation for her complaints of discrimination or for any other discriminatory reason; instead, the language of the Petition suggests that plaintiff believes the charges are being brought so that the District can make Glenn a "scapegoat" for the Sodexho budget shortfall. While such a motive may be reprehensible, it is not prohibited by Title VII.

---

[1] In plaintiff's EEOC request for a "Right To Sue Letter" she claimed that Glenn explained to her the she (Glenn) "felt that she was being discriminated against and that she had been falsely accused of misconduct." Plaintiff's Decl. Exh. 19. Plaintiff does not repeat this statement in her declaration in opposition to summary judgment. Moreover, Glenn pointedly does not state in her declaration submitted in opposition to summary judgment that she told plaintiff that she (Glenn) felt she was being treated differently on account of her age, race or gender. Thus, there is no admissible evidence that plaintiff was aware that Glenn had accused the District of discrimination.

9

Other than the Petition, the only evidence cited by plaintiff to support her claim that she was opposing what she believed to be the District's *discriminatory* (as opposed to merely unfair) practice are the declarations of Mary Glenn and plaintiff. Again, Glenn does not attest that she told plaintiff about her discrimination complaint; instead, Glenn states as follows:

> In August 2002, I advised the District that I intended to file a lawsuit for discrimination based on unequal pay because other managers who managed fewer people were being paid more. In September 2002, the District conducted an investigation based on false allegations that I was accepting gifts for jobs. That month, Laura Carrasco approached me to ask if I had heard that I was being blamed for the $80,000 Sodexho shortfall in the budget. Shortly thereafter, Laura showed me the petition she prepared on my behalf after it was already signed by numerous custodians. I told her to be careful because she might be next.

Glenn Decl. ¶ 7. This paragraph does not give rise to an inference that plaintiff was opposing the discriminatory treatment of Glenn.

Plaintiff states:

> Mary Glenn was the only African-American woman in upper management at the District. I believed the District was discriminating against Mary Glenn by investigating false statements that she was accepting gifts for jobs and was responsible for Sodexho's budget deficit of $80,000.
>
> I wrote a petition dated October 8, 2002 complaining about the District's discrimination against Mary Glenn.

Carrasco Decl. ¶¶ 7-8. The Court does not have to accept plaintiff's characterization of the Petition because the Petition itself--on its face--does not complain about the District's *discrimination* against Mary Glenn; instead, plaintiff wrote a Petition complaining that the charges against Glenn were false and that the District was making Glenn a scapegoat. The pivotal question, then, is whether plaintiff's *uncommunicated* belief that the District was discriminating against Glenn (assuming, for purposes of this motion, that she had such a belief) is sufficient to meet her prima facie burden of showing that her circulation of the Petition was "protected activity."

The Ninth Circuit's decision in <u>EEOC v. Crown Zellerbach Corp.</u>, 720 F.2d 1008 (9th Cir. 1983) is helpful in answering this question. There the plaintiff employees of Crown Zellerbach wrote a letter to the Los Angeles Unified School District Board protesting an

10

affirmative action award the District gave to a Crown Zellerbach employee (Crown Zellerbach was a District supplier). The letter accused the employee of being a bigot, and noted the many substantiated discrimination charges that the E.E.O.C. had brought against Crown Zellerbach. Crown Zellerbach subsequently fired the employees for sending the letter. Id. at 1011.

As it was undisputed that Crown Zellerbach fired the employees for writing the letter, the only issue was whether the sending of the letter was "protected activity." The Ninth Circuit noted that "the employee's statement cannot be 'opposed to an unlawful employment practice' unless it refers to *some* practice by the employer that is allegedly unlawful.'" Id. at 1013. The court concluded that the

> assertedly unlawful employment practices protested by the [plaintiffs] could be discerned from the context of the letter. The letter specifically mentioned the history of unlawful employment practice charges filed against [Crown] by black employees pursuant to Title VII. It stressed that Zellerbach had engaged in a continuing series of unlawful discriminatory employment practices, and that, if the school district officials had consulted the entire record, they would have discovered the persistent complaints about these practices.

Id. The court held that the complaints in the letter "were sufficiently specific to constitute opposition to 'unlawful employment practices.'" Id.

Here, in contrast, there is nothing in the Petition that even hints that plaintiff is opposing an unlawful employment practice, that is, a practice forbidden by Title VII. While the Petition is specific as to the practice plaintiff is opposing, namely, the investigation of Mary Glenn, it does not specify that plaintiff believes the District is investigating Glenn because of her race, gender or age; instead, the Petition suggests that the District is investigating Glenn to make her a scapegoat for a shortfall in the budget. Plaintiff has not cited any cases that hold that an employee has engaged in protected activity under similar circumstances.

In Raad, the Ninth Circuit described the requirement that the plaintiff make some showing that the defendant was aware that the plaintiff had engaged in protected activity as an *additional* element of the prima facie case. 323 F.3d at 1197 ("*In addition*, the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant

11

was aware that the plaintiff had engaged in protected activity") (emphasis added).  Plaintiff, then, has also failed to make a prima facie retaliation case under Raad.  Since the Petition itself does not suggest that plaintiff is complaining about the District's discriminatory treatment of Glenn, and since there is no evidence that plaintiff ever expressed to *anyone*, let alone the persons responsible for her discipline and termination, that she believed the District's treatment of Glenn was motivated by a discriminatory animus, the evidence is insufficient to make a prima facie showing that the District was aware that plaintiff had engaged in "protected activity."

A third way to analyze the issue is through the lens of the causation element.  To make a prima facie case, a plaintiff must show a causal link between the protected activity and the adverse employment action.  "[E]ssential to a causal link is evidence that the employer was aware that the plaintiff was engaged in the protected activity."  See Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982).  If the defendant is not aware of the protected activity, the adverse employment action could not have been taken in retaliation for the protected activity.

Here, there is *no* evidence that anyone was aware that plaintiff had opposed the *discriminatory* treatment of Glenn or that plaintiff had ever alleged that the District was investigating Glenn because of Glenn's age, race or gender.  Plaintiff has therefore not made a prima facie showing that her "opposition" to the District's alleged discriminatory conduct caused the District to discipline her and ultimately terminate her employment.

**B.  Carrasco's March 2003 discrimination complaint**

Carrasco also argues that even if her opposition to the District's treatment of Mary Glenn was not protected under Title VII, she did engage in protected conduct when in her March 2003 letter she stated that the High School was in violation of the District's ethics and non-discrimination regulations.  For purposes of this motion, the Court will assume that plaintiff has satisfied her prima facie burden of showing that her March 2003 letter constituted protected activity, and she has also shown that she suffered an adverse employment action.  She has not made a prima facie showing, however, that there is a causal

12

relationship between her protected activity, that is the March 2003 letter, and the District's termination of her employment.

By March 2003 the administration's discipline of plaintiff had been on-going for at least six months, including the execution of the January 2003 Last Chance Agreement. As the incidents that led to the agreement all occurred prior to the March 26, 2003 letter, they could not have been motivated, even in part, by plaintiff's late March complaint.

The District terminated plaintiff's employment in November 2003, more than five months after she complained about discriminatory treatment. The record does not support a reasonable inference that the termination was caused, even in part, by plaintiff's March 2003 complaint about discriminatory treatment rather than as part of the ongoing pattern of discipline that commenced in September/October 2002, well before plaintiff complained that the administration was discriminating against her. The only evidence plaintiff offers is the fact of the complaint itself and the District's failure to conduct an investigation into her complaint. The District, however, did respond to her complaint and concluded that its treatment of plaintiff was appropriate.

Plaintiff also complains that the District never offered her an improvement plan as promised, and, somewhat contradictorily, that she had improved as requested. She states in her declaration that she executed an improvement plan in September 2003. In any event, assuming these allegations are true, they do not support a prima facie inference that plaintiff's complaint of discrimination–made after she signed the Last Chance Agreement and after several complaints by the High School administration about her performance–motivated the District's termination of her employment. At most, the evidence supports a reasonable inference that the termination was part of the ongoing campaign of discipline that commenced around the time that plaintiff circulated the Petition. As the circulation of the Petition does not constitute activity protected by Title VII, that inference does not defeat the District's summary judgment motion.

//

//

13

# CONCLUSION

It is undisputed that plaintiff suffered several adverse employment actions. And for purposes of the District's summary judgment motion, the Court assumes that plaintiff has made a prima facie showing that her circulation of the Petition was a motivating factor for those adverse employment actions. Summary judgment must nonetheless be granted because plaintiff has not made a prima facie showing that her participation in the Petition constitutes opposition to "any practice made an unlawful employment practice by" Title VII. Nor has she made a prima facie showing that her March 2003 complaint of discrimination played any role in the termination of her employment. At best, the evidence supports an inference that plaintiff opposed the unfair treatment of Mary Glenn. As Title VII does not prohibit an employer from investigating an employee based on false charges, the District's motion for summary judgment is GRANTED in its entirety.

**IT IS SO ORDERED.**

Dated: December 1, 2005

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE